IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| JOHN DOE, | CASE NO.: 2:17-cv-2671-RMG |
| Plaintiff, | **VERIFIED COMPLAINT** (Jury Trial Demanded) |
| v. | |
| COLLEGE OF CHARLESTON, and JANE DOE, | |
| Defendants. | |

## CIVIL ACTION COMPLAINT

Plaintiff John Doe ("John"),[1] by and through undersigned counsel, files this Complaint against Defendants College of Charleston ("CofC") and Jane Doe ("Jane") and, in support thereof, alleges as follows:

## INTRODUCTION

1. Having been irreparably harmed by false allegations of sexual misconduct, John seeks injunctive relief and damages to remedy the emotional, mental, and economic harm caused by Defendants. John's causes of action include: violations of Title IX of the Educational Amendments of 1972 (20 U.S.C. § 1681 et seq.), intentional infliction of emotional distress, tortious interference with a contract, and defamation.

2. Cof C violated Title IX by creating a gender biased, hostile environment against males, like John. Cof C, through its policies and procedures, implemented a disciplinary process that discriminates against males by not affording them basic due process rights, such as the right to be represented by counsel and the right to cross-examine witnesses.

---

[1] See John Doe's Motion to Allow the Parties to Use Pseudonyms for the basis of John Doe's request for using pseudonyms in this proceeding.

1

3. John's harm stems from Jane's relentless campaign to spread false and defamatory allegations that John sexually assaulted her.

4. Jane first made her false and defamatory allegations to members of John's fraternity Pi Kappa Phi, as well as many other students on campus.

5. Jane also made false and defamatory statements to the Charleston Police Department. The Charleston Police Department thoroughly investigated Jane's allegations and closed its file, citing "insufficient evidence and probable cause." The Charleston Police Department found multiple inconsistencies and discrepancies in Jane's allegations.

6. Jane then made her false and defamatory allegations to CofC's Title IX Coordinator at CofC's Office of Equal Opportunity Programs. Instead of relying on the conclusion of the trained investigators of the Charleston Police Department, CofC has persisted in investigating John in violation of Title IX, 20 U.S.C. § 1681 et seq.

7. Absent a preliminary injunction enjoining CofC's investigation of John, John will be forced to endure a needless disciplinary process riddled with gender bias and procedural flaws.

8. John brings this suit to enjoin the unlawful investigation by CofC of Jane's allegations and to recover a monetary judgment for the harm he has sustained and continues to sustain because of Jane's false and defamatory allegations.

**PARTIES**

9. John is a United States citizen who resides in the United Kingdom. John was a student at CofC during the 2016-2017 school year.

10. CofC is a public institution within the South Carolina public university system. It is headquartered in Charleston, South Carolina and has a total undergraduate enrollment of approximately 12,000 students.

2

11.     At all times relevant to this Complaint, CofC acted by and through its agents, servants, employees and representatives who were working in the course and scope of their official duties and /or employment, in the promotion of CofC's business, mission and/or affairs.

12.     During all times relevant to this Complaint, Jane was a student and enrolled at CofC.  Upon information and belief, she is a citizen of the state of South Carolina.

## JURISDICTION AND VENUE

13.     John invokes this Court's original jurisdiction under 28 U.S.C. § 1331 as the civil claims herein arise under the laws of the United States, specifically Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681, et seq. (hereinafter referred to as "Title IX")  for CofC's unlawful sex discrimination.

14.     John also invokes this Court's jurisdiction over related state law claims under the principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367. The state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

15.     The injunctive relief sought in this matter is authorized by Federal Rule of Civil Procedure 65.

16.     Venue in this action is proper under 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to John's claims occurred in this judicial district.

## BACKGROUND FACTS

**A.     John's Decision to Attend CofC.**

17.     John transferred after his freshman year from Ithaca College to CofC because he was looking to study marketing in a business school rather than in a communications program.

**B.     John Had Consensual Sexual Intercourse with Jane Doe.**

18.     John was enrolled as a student at CofC during the 2016-2017 school year. During the 2016-2017 school year, John was a sophomore at CofC and a marketing major.

19.     John was also a member of the Pi Kappa Phi ("Pi Kapp")[2] fraternity and resided in the Sterling Campus Center Apartments ("CCA").

20.     Jane was enrolled as a student at CofC during the 2016-2017 school.

21.     Jane is a member of the Zeta Tau Alpha ("Zeta") sorority and lives alone at her apartment in CCA.

22.     The Pi Kapp fraternity and the Zeta sorority often throw joint events together. On April 10, 2017, the two groups hosted a "Coachella" themed party at Club Mynt.

23.     John and Jane met at that party on April 10, 2017. The two befriended each other on various social media sites before the party, but met for the first time that night. Both before and during the party at Club Mynt, John and Jane consumed alcohol.

24.     CofC students recall Jane not appearing intoxicated when she left the party.

25.     Zeta has a risk management director who oversees Zeta's parties. It is the risk management director's responsibility to look after members and send home members who are too intoxicated.

26.     One of Zeta's risk management officers recalls that Jane, on the evening of April 10, 2017, did not appear to be incapacitated due to alcohol consumption. Jane was able to leave the party under her own power and, in fact, signed out of the party demonstrating that she was leaving.

---

[2] For reasons unrelated to this lawsuit, Cof C recently closed its chapter of Pi Kapp until Fall 2019.

4

27. Jane and John left the party together because they both lived at CCA. John first asked Jane if she wanted to go to Pi Kapp's fraternity house to hang out. However, the two were turned away from the fraternity house as Pi Kapp was hosting a pledge event.

28. As they left the Pi Kapp house, Jane invited John to her room to smoke marijuana. One of Jane's friends offered to walk Jane home instead, but Jane rebuffed that offer and told her friend that she and John were going to smoke marijuana and that she was all right.

29. Upon arriving at Jane's apartment, Jane and John watched television and hung out. They engaged in consensual sexual activity, including oral sex and, briefly, unprotected sexual intercourse. While they engaged in consensual intercourse, Jane asked John if he had a condom. He said he did not, but that he have one in his bedroom in his apartment downstairs.

30. Jane and John stopped intercourse and went to John's apartment to retrieve a condom. However, they did not engage in sexual activity the remainder of the night.

31. Instead, they chose to go to a CVS store to buy food.

32. After buying food, Jane and John returned to Jane's apartment where they watched television in Jane's bedroom until John left early on the morning of April 11, 2017.

33. Later that day, Jane texted John stating that she was "blackout" and "felt like you took advantage of me." John immediately responded, "I literally did not do anything that you didn't want me to do, I asked you multiple times." After confirming that John obtained consent, Jane acknowledged, "ya same I appreciate you being straight up with me." These text messages are attached as Exhibit "A". Notwithstanding the fact that Jane and John engaged in consensual sex, Jane lodged a campaign against John in which she falsely claimed to have been the victim of sexual assault.

5

**C.   John Converts to Inactive Status with Pi Kapp and Takes a Leave of Absence from Cof C Due to Jane's Lies.**

34.   Shortly after the consensual sexual encounter, Jane approached leadership at Pi Kapp and claimed that John sexually assaulted her. She issued an ultimatum to leadership: either John resigns from the fraternity or she would file a complaint with law enforcement.

35.   Once John learned of Jane's false claims and the ultimatum that she gave to Pi Kapp student leadership, John panicked. Although he had done nothing wrong, John converted his fraternity membership status to inactive.

36.   At the end of the 2017 spring semester, John questioned whether he even wanted to return to CofC. He was terrified of Jane spreading additional false accusations; he was isolated from his peers; he was wracked with depression and anxiety. Thus, after completing his final examinations, John filed for a leave of absence from CofC.

**D.   Jane Files a Police Report Against John.**

37.   On June 23, 2017, over two months after her alleged assault by John, Jane filed a criminal complaint with the Charleston Police Department and claimed that John sexually assaulted her on the evening of April 10, 2017 and/or the early morning hours of April 11, 2017.

38.   Detective Daniel Wilson of the Charleston Police Department was assigned to investigate Jane's allegations.

39.   When Detective Wilson asked Jane why she delayed in filing a police report, Jane said "because he [sic] would be 'healing for her and pursuing a charge against [John] would result in either him having to be registered as a sex offender or go through the fear of being charged as one. She further stated that he needed to learn a lesson from the experience."

40.   Over the course of two months, Detective Wilson and the Charleston Police Department conducted a thorough investigation that culminated in a thirty-four   page

investigative police report. Their investigation concluded that "there was insufficient evidence and probable cause in support of the alleged sexual assault."

41. On July 28, 2017, Jane texted John saying, "you have it coming for you, and you're absolutely f****d." John forwarded this text message to law enforcement.

42. Incidentally, later that day, Detective Wilson recommended the case be listed as "Pending Inactive." A full copy of the police report is attached as Exhibit "B".

43. After learning that John would not be prosecuted, Jane pressed on with her false claims by filing a Title IX Complaint at Cof C against John.

**E.     Jane Files a Title IX Complaint at Cof C against John.**

44. On August 3, 2017, John received from CofC's Title IX Coordinator, Kimberly Gertner, a letter informing him that Jane filed a Title IX complaint alleging that on the evening of April 10, 2017 and/or the early morning hours of April 11, 2017, John committed several acts of sexual misconduct in violation of CofC's Student Sexual Misconduct Policy (Section 2.0) and the policy on the Prohibition of Discrimination and Harassment, Including Sexual Harassment and Abuse (Section 5.0). CofC's August 3, 2017 letter is attached as Exhibit "C". The pertinent policy excerpts are attached as Exhibit "D".

45. Unmentioned in CofC's letter is the fact that Jane's allegations had already been investigated by the Charleston Police Department and that a trained detective concluded that "there was insufficient evidence and probable cause in support of the alleged sexual assault."

46. Despite the fact that CofC had been in contact with law enforcement, CofC has persisted in investigating Jane's claims.

7

47. On August 7, 2017, John filed a discrimination/harassment complaint with CofC's Office of Equal Opportunity Programs against Jane based on her false allegations and further acts of harassment and intimidation.

48. On August 23, 2017, Ms. Gertner and Ms. Leya Nelson, the Title IX Investigator at CofC, conducted a telephonic interview of John. John denied that he sexually assaulted Jane. He discussed the circumstances surrounding his decision to take inactive status with Pi Kapp, as well as his decision to take a leave of absence from CofC. John also reiterated that the Charleston Police Department previously investigated Jane's allegations against him and closed the file.

49. On September 8, 2017, counsel for John sent a letter to CofC's legal counsel, with carbon copies to Ms. Gertner and Ms. Nelson, requesting that CofC immediately cease and desist their Title IX investigation of John based on the fact that the Charleston Police Department had already found insufficient evidence to support Jane's allegations.

50. CofC, however, has continued to investigate allegations already deemed to have insufficient evidentiary support.

**F.     CofC's Actions in Continuing to Investigate Jane's Allegations Demonstrate Gender Bias.**

51. In taking unfair, unjust, and indefensible action against a male student who the Charleston Police Department declined to pursue criminal charges against citing insufficient evidence and a lack of probable cause, CofC was infected by an anti-male bias that has swept across America's colleges and universities and is only now being identified and challenged. This bias flows from years of criticism directed at colleges for purportedly being too lax in punishing sexual assault.

52.     Colleges and universities, spurred by the federal government's Title IX regulations and guidance, have recently cracked down on alleged perpetrators of sexual assault. Unfortunately, this crackdown has resulted in a reduction of reasonableness and fairness in the treatment of those accused. It has led to problems such as de facto presumption of guilt on the part of accused male students, pursuant to which accused students are required to prove they had consent while the accusers are not required to prove they were assaulted, and findings of guilt based on the very lowest standard of proof – preponderance of the evidence.

53.     On April 11, 2011, the U.S. Department of Education's Office of Civil Rights ("OCR") sent a "Dear Colleague Letter" to colleges and universities. The letter indicated that, in order to comply with Title IX, colleges and universities were required to have transparent, prompt procedures to investigate and resolve complaints of sexual misconduct. The Letter purported to provide guidance to schools regarding the unique issues that arise in sexual misconduct cases. In reality, however, the Letter has encouraged schools to operate sexual misconduct proceedings in a more victim-centered manner by, for example, allowing the alleged victim (who is almost always female) the right to appeal decisions (leading to a form of double jeopardy), encouraging schools to utilize the lowest standard of proof ("more likely than not"), and rushing timelines for investigation and adjudication.

54.     The Dear Colleague Letter was a step in the increased enforcement of Title IX on college and university campuses. NPR, in an August 12, 2014 report titled How Campus Sexual Assaults Came to Command New Attention, described the Dear Colleague Letter as the government's "first warning shot."

55.     In May 2014, the U.S. Department of Education disclosed for the first time the names of colleges under investigation for possibly violating federal rules aimed at stopping

sexual harassment. The Washington Post reported in March 2015 that the Office for Civil Rights was seeking to hire up to 200 more investigators. At that time, the federal government was investigating well over 100 schools for possible Title IX violations, including many of the top private and state universities in the country.

56. In February 2014, Catherine E. Lhamon, the Assistant Secretary of Education who headed the department's OCR, told college officials attending a conference at the University of Virginia that schools needed to make "radical" change. According to the publication "Chronicle of Higher Education," college presidents suggested afterwards that there were "crisp marching orders from Washington." (Colleges Are Reminded of Federal Eye on Handling of Sexual-assault Cases, Chronicle of Higher Education, February 11, 2014.)

57. Universities and colleges now fear being investigated or sanctioned by the OCR. The federal government has created a significant amount of pressure on these institutions to treat all those accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education noted that "colleges face increasing pressure from survivors and the federal government to improve the campus climate." (Source: Presumed Guilty: College men accused of rape said the scales are tipped against them, Chronicle of Higher Education, September 1, 2014.) In the same article, the Chronicle noted that different standards were applied to men and women. "Under current interpretation of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent."

58. Lhamon told a national conference at Dartmouth in the summer of 2014, "I will go to enforcement, and I am prepared to withhold federal funds." (Source: How Campus Sexual

Assault Came to Command New Attention, NPR, August 12, 2014). In the same story, Anne Neal of the American Council of Trustees and Alumni was quoted as stating, "There is a certain hysteria in the air on this topic… . It's really a surreal situation, I think." Neal explained that schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of the accused instead.

59.     In June 2014, Lhamon told a Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX…" She further told the Committee, "If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. To revoke federal funds – the ultimate penalty – is a powerful tool because institutions receive billions of dollars a year from the federal government for student financial aid, academic resources and many other functions of higher education."

60.     Robert Dana, Dean of Students at the University of Maine, told NPR that some rush to judgment is inevitable. "'I expect that that can't help but be true,' he says. 'Colleges and universities are getting very jittery about it.'" (Source: Accused of Sexual Assaults on Campus Say System Works Against Them, NPR, September 3, 2014.)

61.     On September 22, 2017, the OCR announced in an interim Dear Colleague Letter, that it was withdrawing the statements of policy and guidance reflected in the 2011 Dear Colleague Letter on Sexual Violence and the 2014 Questions & Answers on Title IX and Sexual Violence. In doing so, the Department of Education noted that "[t]he 2011 and 2014 guidance documents may have been well-intentioned, but those documents have led to the deprivation of rights for many students."

# CAUSES OF ACTION

## Count I
### (Violation of Title IX 20 U.S.C. § 1681 et seq.)
*(Against Cof C)*

62. John repeats and incorporates all the preceding allegations of this Complaint, as if fully set forth herein.

63. Title IX provides, in relevant part, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

64. Title IX is enforceable through an implied right of action affording to an individual discriminated against due to his or her gender pecuniary damages and equitable relief.

65. Upon information and belief, CofC receives federal funding, including in the form of federal student loans given to students.

66. Because it receives federal funding, CofC is subject to the requirements of Title IX.

67. Title IX prohibits discrimination in the education setting based on a student's gender. Unlawful gender discrimination also occurs when a university disciplines students based on archaic assumptions about gender roles and preferences.

68. CofC's conduct, as described above, discriminated against John, on the basis of his sex, through discriminatory, gender-biased implementation of CofC's policies and procedures in the wake of pressure from the U.S. Department of Education.

69. Upon information and belief, female students subject to disciplinary proceedings at CofC are treated differently than male students.

70. CofC's decision to investigate Jane's allegations was motivated by the gender of her alleged assailant, John.

71. CofC has failed to remediate its discriminatory actions against John.

72. As a result of CofC's acts and omissions as described above, John has suffered multiple forms of damage, including diminished earning capacity, lost career and business opportunities, litigation expenses including attorneys' fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress, and other compensatory damages, in an amount to be determined by a jury and the Court.

### Count II
### (Intentional Inflectional of Emotional Distress)
(*Against Jane Doe*)

73. John repeats and incorporates all the preceding allegations of this Complaint, as if fully set forth herein.

74. As described herein the actions of Jane caused John severe emotional distress. John has suffered from anxiety, isolation, and depression as a result of Jane's false and defamatory allegations. He stopped contacting most of his friends from CofC and converted to inactive status with his fraternity. Additionally, John took a leave of absence from CofC.

75. On July 28, 2017, Jane texted John stating as follows: "you have it coming for you, and you're absolutely f****d." This text caused John even greater anxiety and fear over what Jane was willing to do to him.

76. Further, as a consequence of Jane's actions, John has suffered severe emotional distress in that the CofC is continuing to investigate Jane's allegations, despite the conclusion reached by the Charleston Police Department. John is worried and anxious regarding the results of the investigation because he knows the repercussions of a sexual misconduct notation on his transcript.

77. As described above, the actions taken by Jane establish that she intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from their conduct.

78. Jane's conduct was so extreme and outrageous as to exceed all possible bounds of decency. She made at least three false reports that John sexually assaulted her; each false report was motivated by a desire to harm John. Consequently, CofC has facilitated Jane's mission to harm John by continuing an investigation into Jane's allegations after the Charleston Police Department concluded its investigation by citing insufficient evidence and probable cause to support Jane's allegations.

79. The actions of Jane, and consequences of same, have caused, both actually and proximately, John to suffer severe emotional distress, and physical manifestations, including but not limited to, loss of sleep, weight gain, depression and anxiety.

80. As a direct and foreseeable consequence of Jane's intentional infliction of emotional distress, John has sustained significant damages including, but not limited to, diminished earning capacity, lost career and business opportunities, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be determined by a jury and the Court.

**Count III**
**(Tortious Interference with Contract)**
(*Against Jane Doe*)

81. John repeats and incorporates all the preceding allegations of this Complaint, as if fully set forth herein.

82. John has a contract with CofC through the Student Handbook.

83. Upon information and belief, Jane was aware of the contract between John and CofC.

84. Jane intentionally, and without justification, attempted to procure the breach of John's contract with CofC. She did so by making three false and defamatory reports that John sexually assaulted her:

    a. Her report to Pi Kapp student leadership that she would go to the authorities if John was not removed as a member;

    b. Her June 23, 2017 police report where she falsely claimed that she was sexually assaulted; and

    c. Her Title IX complaint.

85. Jane told Detective Wilson of the Charleston Police Department that she "would like this resolved by terminating [John's] status here at the College of Charleston."

86. As a direct and foreseeable consequence of Jane's tortious interference with contract, John has sustained significant damages including, but not limited to, diminished earning capacity, lost career and business opportunities, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be determined by a jury and the Court.

**Count IV**
**(Defamation)**
(*Against Jane Doe*)

87. John repeats and incorporates all the preceding allegations of this Complaint, as if fully set forth herein.

88. Jane orally and in writing defamed John Doe by falsely alleging he committed sexual misconduct as described in Paragraph 84 of this Complaint.

89. Jane knew and intended her defamatory statements to be heard and/or read by persons in the city of Charleston, members of CofC community and in the state of South Carolina, and intended her defamatory statements to damage the professional and personal reputation of John.

90. Jane made and published her defamatory statements with knowledge of falsity, especially in light of her consensual behavior, as well as reckless disregard of their falsity.

91. As a direct and proximate cause of Jane's defamation, John's character and reputation, at CofC and in the community at large, was impaired and he suffered, and will continue to suffer, mental anguish, personal humiliation, and a great loss of reputation.

92. As a further direct and proximate cause of Jane's defamation, John was investigated by the Charleston Police Department, unlawfully investigated by CofC, which has or will result in, among other consequences and damages, loss of employment opportunities and/or wages, loss of educational opportunities, difficulty in gaining entrance to a graduate or law school, reduced future earning capacity, and attorneys' fees.

93. That Jane's statements were of and concerning John, were published to third persons, and were false and defamatory. They communicated that John engaged in morally depraved criminal activity. Consequently, the defamation was actionable per se, meaning that damages are presumed under well-established South Carolina jurisprudence.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, John Doe, seeks the following relief from the Court:

a) A preliminary and permanent injunction prohibiting CofC and its agents and/or employees from completing their Title IX investigation of Jane Doe's allegations;

b) An award of attorneys' fees, expenses, and costs; and,

c)	Monetary damages in an amount to be proven at trial; and

d)	Any further relief that the Court deems just and proper.

## JURY DEMAND

Plaintiff John Doe hereby demands a trial by jury of all issues so triable.

    Respectfully submitted,

    DeANTONIO LAW FIRM, LLC

    *s/Stephen F. DeAntonio*
    Stephen F. DeAntonio, Fed. Id. No. 1049
    Post Office Box 30069
    Charleston, SC 29417
    (843) 577-8080
    (843) 577-4188 (fax)
    deantonio@deanlawfirm.com

    Attorney for the Plaintiff

October 4, 2017
Charleston, South Carolina