IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| JOHN DOE, ) | C/A NO.:  2:17-cv-2671-RMG |
| ) | |
| Plaintiff, ) | |
| ) | **PLAINTIFF'S BRIEF IN SUPPORT** |
| v. ) | **OF MOTION FOR PRELIMINARY** |
| ) | **INJUNCTION** |
| COLLEGE OF CHARLESTON, *et al.* ) | |
| ) | |
| Defendants. ) | |

**INTRODUCTION**

Title IX has the laudable purpose of prohibiting sex discrimination in educational institutions that receive federal funding.  Pursuant to guidance that emanated from the U.S. Department of Education in 2011, Title IX requires schools to respond to and remedy sexual discrimination and violence on campus.  Failure to do so places schools in jeopardy of losing federal funding.  As is documented in the Complaint, however, schools have responded to the immense pressure imposed by the Department of Education's Office for Civil Rights ("OCR") with a degree of overzealous enforcement.

The irony created by this overwrought enforcement climate is that in the name of protecting women from sexual misconduct on campus, a great number of colleges and universities have created and systematized a discriminatory regime against men.  The threat of lost funding and the fury expressed by the so-called "accusers' rights" movement have left school administrators so intimidated that even a young male student like the Plaintiff herein – a student who was cleared of any wrongdoing by the Charleston Police Department – could become a victim of the Title IX frenzy.

In order to remediate the unintended backlash from OCR's 2011 guidance, on September 22, 2017, OCR issued new guidance in the form of an interim Dear Colleague Letter, which is attached as Exhibit "A". This new guidance begins to level the playing field by withdrawing OCR's 2011 and 2014 guidance. Most germane to the instant matter, the interim guidance makes clear that schools may rely upon investigations conducted by law enforcement to resolve Title IX complaints.

## FACTUAL BACKGROUND

Plaintiff John Doe ("John") was enrolled as a student at CofC during the 2016-2017 school year. John was a sophomore at CofC and a marketing major. He was also a member of the Pi Kappa Phi ("Pi Kapp")[1] fraternity. John resided in the Sterling Campus Center Apartments ("CCA"). Defendant Jane Doe ("Jane") was enrolled as a student at CofC during the 2016-2017 school. At all relevant times, Jane was a member of the Zeta Tau Alpha ("Zeta") sorority and lived alone at CCA.

The Pi Kapp fraternity and the Zeta sorority often coordinate parties together. On April 10, 2017, the two groups hosted a "Coachella" themed party at Club Mynt. When Zeta sponsors parties, it appoints members to monitor the alcohol intake of members. Zeta has a risk management director who oversees its parties and who is tasked with looking after members at social events and assisting members who are overly intoxicated.

John and Jane met at the party on April 10, 2017. The two had befriended each other on various social media sites before the party, but they met for the first time that night. Both before and during the party at Club Mynt, John and Jane consumed alcohol. Students at the party recall Jane *not* appearing intoxicated when she left the party. Indeed, a Zeta risk management officer

---

[1] For reasons unrelated to this lawsuit, CofC closed its chapter of Pi Kapp until Fall 2019.

recalled that Jane did not appear to be overly intoxicated and that Jane left the party under own power and, in fact, signed out before doing so.

John, Jane, and several of their friends departed the party together. John and Jane started to walk back to CCA because they both lived there. While walking, John asked Jane if she wanted to go to Pi Kapp's fraternity house to hang out. Jane agreed. Upon their arrival at the Pi Kapp house, John and Jane were turned away as Pi Kapp was hosting a pledge event.

After leaving the Pi Kapp house, Jane invited John to her room to smoke marijuana and hang out. One of Jane's friends offered to walk Jane home but Jane rebuffed that offer and told her friend that she and John were going to smoke weed and that she was all right. Jane's friend did not disagree with that conclusion.

Upon arriving at Jane's apartment, John and Jane watched television and hung out for a short period of time. They began engaging in consensual sexual activity, including oral sex and, briefly, intercourse. While they engaged in intercourse, Jane asked John if he had a condom. He explained that he had a condom in his apartment downstairs. Jane and John then went to John's apartment to retrieve a condom. However, they did not engage in sexual activity the remainder of the night. Instead, they went to a CVS store to buy food and then they returned to Jane's apartment. John stayed with Jane until approximately 5:00 a.m.

The next day, Tuesday, April 11, 2017, Jane texted John about the prior evening. She stated that she was "blackout" and that she "felt like you took advantage of me." John immediately responded, "I literally did not do anything that you didn't want me to do, I asked you multiple times." Jane conceded, "Ya same I appreciate you being straight up with me."

Notwithstanding her admission, Jane has lodged a campaign against John by creating a false version of the events in question.

**A.    John Converts to Inactive Status with Pi Kapp and Takes a Leave from CofC due to Jane's Lies.**

Shortly after the consensual sexual encounter, Jane approached leadership at Pi Kapp, and claimed that John sexually assaulted her. She issued an ultimatum to leadership: either John resigns from the fraternity or she would file a complaint with the authorities. Pi Kapp leadership passed her ultimatum on to John on April 17, 2017. John panicked, and although he had done nothing wrong, converted his fraternity membership status to inactive.

At the end of the spring semester, John questioned whether he wanted to return to CofC. He was terrified of Jane spreading additional false accusations. Further, he was wracked with depression and anxiety and isolated from his peers. Thus, after completing his final examinations, John decided to take a leave of absence from CofC.

**B.    Jane Files a Police Report Against John.**

On June 23, 2017, over two months after the alleged assault, Jane filed a criminal complaint with the Charleston Police Department. She alleged that John sexually assaulted her on or about April 10, 2017 and/or the early morning hours of April 11, 2017. Detective Daniel Wilson was assigned to investigate Jane's claims. He conducted a thorough two-month investigation culminating in a thirty-four-page police report. Despite knowing police were investigating her claims, Jane has pressed on with her desire to inflict emotional distress on John. On July 28, 2017, Jane texted John the following message: "you have it coming for you, and you're absolutely f****d." John provided the text message to the Charleston Police Department. Ultimately, Detective Wilson concluded that that "there was insufficient evidence and probable cause in support of the alleged sexual assault." Detective Wilson recommended the case be listed as "Pending Inactive."

4

### C.     Jane Files a Title IX Complaint at CofC against John.

On August 3, 2017, John received a letter from Defendant Kimberly Gertner ("Gertner"), Director and Title IX Coordinator at CofC, informing him that Jane filed a Title IX complaint against him alleging that on the evening of April 10, 2017 and/or the early morning hours of April 11, 2017 John committed several acts of sexual misconduct in violation of CofC's Student Sexual Misconduct Policy and the policy on the Prohibition of Discrimination and Harassment, Including Sexual Harassment and Abuse.  Unmentioned in Gertner's letter was the fact that Jane's allegations had already been investigated by Detective Wilson who concluded that "there was insufficient evidence and probable cause in support of the alleged sexual assault."  Gertner assigned Defendant Leya Nelson ("Nelson") to investigate Jane's allegations at CofC.

John sent a letter via electronic mail to Jeri Cabot, Dean of Students and Associate Vice President at CofC and to Gertner on August 9, 2017.  In the letter, John notified Gertner and Cabot that he wished to file a complaint against Jane for her acts of harassment and intimidation in filing a false and defamatory Title IX complaint against him.  John, in the letter, put Gertner, Cabot, and CofC on notice that "the Charleston Police Department closed its investigation. Detective Wilson determined that the evidence did not satisfy the standard of probable cause, which is a reasonable belief that a crime was committed.  This standard is even lower or less exacting than the preponderance of the evidence standard that governs Title IX complaints." Accordingly, John requested that CofC dismiss Jane's Title IX complaint.  On August 23, 2017, John filed a formal discrimination/harassment complaint with CofC's Office of Equal Opportunity Programs against Jane based on her false allegations and further acts of harassment and intimidation.  This formal complaint included and incorporated John's August 9 letter.  To date, John has received no response to his request that CofC dismiss Jane's Title IX complaint.

On September 8, 2017, counsel for John sent a letter to CofC's general counsel with copies sent to Gertner and Nelson requesting that they immediately cease and desist their Title IX investigation of John based on the fact that the Charleston Police Department had already found insufficient evidence to support Jane's allegations. Undersigned counsel attached to their letter a complete copy of the police report created by the Charleston Police Department. CofC did not respond to the letter.

Absent a preliminary injunction enjoining CofC from investigating John, John will be irreparably harmed.

## LAW AND ARGUMENT

A preliminary injunction serves to preserve the status quo pending a final trial on the merits, while a temporary restraining order is used to preserve the status quo only until a hearing for a preliminary injunction can be held. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999); *see also Microsystems, Inc. v. Microsoft Corp.*, 333 F.3d 517, 531 (4th Cir. 2003) (recognizing that a preliminary injunction serves to protect the status quo in order to preserve the court's ability to render a meaningful judgment). To obtain a preliminary injunction, a plaintiff must demonstrate all of the following elements:

1) The plaintiff is likely to succeed on the merits;

2) The plaintiff will suffer irreparable harm if the preliminary injunction is not granted;

3) The balance of hardships favor the plaintiff; and

4) The injunction is in the public interest.

*Metro. Reg'l Info. Sys. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 595 (4th Cir. 2013) (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, (2008)). John can meet each of those four elements; thus, this Court should enter a preliminary injunction enjoining CofC and Gertner.

**A.     Plaintiff Has a Strong Likelihood of Success on the Merits.**

  **1.     Title IX**

Title IX is a federal statute designed to prevent sexual discrimination and harassment in educational institutions receiving federal funding. 20 U.S.C. § 1681. It provides that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a).

In the recent case of *Doe v. Brown University*, 2016 U.S. Dist. LEXIS 21021, (D.R.I. Feb. 22, 2016), the United States District Court of Rhode Island noted that the pressure on colleges and universities from the United States Department of Education's Office for Civil Rights ("OCR") has caused backlash against male students. Not only is this fact fully detailed in John's Complaint, but it was just the subject of a timely acknowledgement by the Department of Education. Recognizing the curtailment of due process rights caused by the 2011 Dear Colleague Letter, on September 22, 2017, the Department of Education withdrew the 2011 Dear Colleague Letter and the 2014 Questions & Answers.

The Fourth Circuit's case law identifies three separate and distinct theories of liability under Title IX: (1) erroneous outcome; (2) selective enforcement; and (3) deliberate indifference. *See Doe v. Washington & Lee Univ.*, No. 6:14-cv-00052, 2015 U.S. Dist. LEXIS 102426, at *26 (W.D. Va. Aug. 5, 2015) (following framework developed in *Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994)); *Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 700 (4th Cir. 2007) (en banc) (noting that an institution can be held liable for a Title IX violation if it displays "deliberate indifference" to discrimination). In this case, John is likely to prevail under the deliberate indifference and selective enforcement theories.

### *a.     Deliberate Indifference*

Under the deliberate indifference standard, an institution is liable under Title IX if an official of the institution who has authority to institute corrective measures on behalf of the institution has actual notice of and is deliberately indifferent to misconduct. *See Gebser v. Lago Vista Indep. School Dist.*, 524 U.S. 274, 277 (1998); *see also Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 752 (S.D. Ohio 2014) (applying deliberate indifference standard to student disciplinary case and holding that student's deliberate indifference claim survived motion to dismiss). In this case, the misconduct that forms the basis for John's deliberate indifference claim is CofC's continued investigation of John and refusal to dismiss the Title IX action against him. CofC ignored John's warnings that Jane's allegations were unfounded based on the investigation conducted by the Charleston Police Department.

The *Wells* court held that the plaintiff student stated a Title IX claim based on deliberate indifference on similar facts. In *Wells*, the plaintiff student alleged that he was falsely accused of sexual assault by a fellow student. *Id.* at 747. The sexual assault allegations were first investigated by the Hamilton County Prosecutor's Office, which doubted the rape allegations against the plaintiff. *Id.* at 748. The Hamilton County Prosecutor's Office attempted to communicate their doubts to the president of the university. *Id.* Despite the Prosecutor's concerns, the university proceeded with a disciplinary hearing against plaintiff; the hearing resulted in the university expelling the plaintiff. *Id.* On those facts, the *Wells* court held that the plaintiff student stated a claim that the university was deliberately indifferent to his rights. *Id.* at 752.

The matter, *sub judice,* is no different from *Wells*. Here, John notified CofC *twice* that the Charleston Police Department found insufficient evidence and probable cause to support

Jane's allegations. Despite having this information, CofC has persisted in its investigation of John. The fact that CofC has not immediately ceased its investigation on that fact alone evinces its gender bias.

CofC's Student Sexual Misconduct Policy, Section 7.2 provides:

> A preponderance of the evidence is the standard adopted by this Policy to determine if a Student has engaged in Sexual Misconduct. A preponderance of the evidence means that credible information shows it is "more likely than not" that the Respondent violated this policy. Because the standard of evidence for the conviction of a crime ("beyond a reasonable doubt") is different from the standard used to determine a violation of this Policy ("a preponderance of the evidence"), the outcome of a police investigations or criminal trial is not determinative of whether alleged Sexual Misconduct violates this Policy. Therefore, conduct may constitute Sexual Misconduct under this Policy even if law enforcement authorities lack sufficient evidence of a crime and decline to prosecute.

As written and applied to John, this Policy constitutes to gender bias. The Policy refuses to give due consideration to the outcome of investigations by trained law enforcement. John takes no issue with CofC doing so where a case is filed and a trial ensues using a higher standard of proof than preponderance of the evidence, such as beyond a reasonable doubt. But, as is the case here, where the police utilize a lower standard of proof than preponderance of the evidence, then CofC should find that conclusion dispositive and dismiss its investigation.

Stated simply, the Charleston Police Department's conclusion that there is insufficient evidence and probable cause in support of Jane's allegations should resolve CofC's Title IX investigation. CofC employs a preponderance of the evidence standard to determine whether John, or any other student, violated its policies. Student Sexual Misconduct Policy, Section 7.2. When investigating whether Jane's allegations against John warranted criminal charges,

Detective Wilson and the professional investigators of the Charleston Police Department employed a less demanding standard of proof: probable cause.

"The substance of all the definitions of probable cause is a reasonable ground for belief of guilt," but this means far "less than evidence which would justify condemnation or conviction," *Brinegar v. United States*, 338 U.S. 160, 175 (1949) (internal quotation marks omitted), and even less than that required by the preponderance-of-the-evidence standard, see *Illinois v. Gates*, 462 U.S. 213, 235 (1983); see also *People v. Hardacre*, 90 Cal.App.4th 1392, 1400, 109 Cal.Rptr.2d 667 (2001) ("Probable cause has a lower threshold of proof than proof beyond a reasonable doubt or by a preponderance of the evidence."). In other words, "[t]he probable cause standard does not demand any showing that such a belief be correct or more likely true than false." *United States v. Jones*, 31 F.3d 1304, 1313 (4th Cir. 1994). In contrast, preponderance of the evidence is "evidence that has the most convincing force; superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other . . . however slight the edge may be." *Tatum v. RJR Pension Invest. Commt.*, 855 F.3d 553, 562 (4th Cir. 2017).

Plainly, the Charleston Police Department employed a less demanding standard of proof than CofC does.[2] It logically follows that if the police did not find evidence in support of Jane's claims that meets the threshold of probable cause, CofC cannot prove that John violated its policy by a preponderance of the evidence. CofC's failure to recognize this point constitutes evidence of its deliberate indifference.

---

[2] A comparison of the different standards of proofs is explained by the NCHERM Group Title IX expert, Brett Sokolow, in an article dated September 15, 2017, attached hereto as Exhibit "B".

As previously mentioned, of particular relevance to the instant matter is the fact that on September 22, 2017, the Department of Education withdrew the 2011 Dear Colleague letter and the subsequent 2014 Questions & Answers. The rescinded documents previously "forbade schools from relying on investigation of criminal conduct by law enforcement authorities to resolve Title IX complaints." *See* Exhibit A. However, the prohibition against reliance on law enforcement investigation is no longer in place. Clearly, the Department of Education is recognizing that educational institutions should defer to the findings of trained law enforcement when addressing claims of sexual assault.

### b.     *Selective Enforcement*

The facts as pled demonstrate that CofC has violated Title IX by selectively enforcing its policy in a gender biased fashion. A selective enforcement claim "asserts that, regardless of the [plaintiff's] guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the [plaintiff's] gender." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). At this stage in the proceeding, John is not able to offer more specific examples or statistics to demonstrate bias (*i.e.*, that CofC deliberately favors women over men). As a district court recently noted:

> One particular challenge in these types of cases is that the best information for discerning whether alleged discrimination was based on the plaintiff's gender as opposed to his status as an accused student is generally in the possession of the defendant: namely, what are the overall outcomes of such cases and, more specifically, how have cases been handled in which the accused student is female and/or the alleged victim is male?. . . . Requiring that a male student conclusively demonstrate, at the pleading stage, with statistical evidence and/or data analysis that female students accused of sexual assault were treated differently, is both practically impossible and inconsistent with the standard used in other discrimination contexts.

*Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 187, 189 (D.R.I. 2016).

11

While the *Brown* case was decided on a motion to dismiss, the court's reasoning applies here too. CofC has control over the data relevant to gender and the facts, as pled by John, show a likelihood of success on the merits.[3]

### 2. Intentional Infliction of Emotional Distress

To recover for the intentional infliction of emotional distress,[4] a plaintiff must establish four elements of the tort: (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, and utterly intolerable in a civilized community; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was severe so that no reasonable man could be expected to endure it. *Ford v. Hutson*, 276 S.C. 157, 162, 276 S.E.2d 776 (1981).

John has suffered and will continue to suffer severe emotional distress because of CofC's investigation. He gained almost twenty pounds and has completely isolated himself from his peers as a result of Jane's allegations. When John learned that the Charleston Police Department had closed its investigation and would not pursue a prosecution, John felt immensely relieved. His relief was short lived, however, due to CofC's notice that it was conducting a Title IX investigation into Jane's very same claims.

After John's interview with Kimberly Gertner, CofC's Title IX Officer, and Leya Nelson, CofC's Title IX Investigator, John again believed he was out of the proverbial woods. During the interview, he informed Ms. Gertner and Ms. Nelson of the Charleston Police Department's

---

[3] John notes for the record that he has filed a Motion for Expedited Discovery contemporaneously with this Motion.

[4] In South Carolina, intentional infliction of emotional distress is commonly known as the tort of outrage. *Roberts v. City of Forest Acres*, 902 F. Supp. 662, 672 (D.S.C. 1995).

investigation. And his legal counsel did so as well on September 8, 2017. Despite these clear indications that Jane's allegations are meritless, CofC has persisted with its investigation. Although CofC has not yet imposed any sanction on John, CofC intentionally inflicted emotional distress on John by continuing to investigate Jane's allegations after the Charleston Police Department found insufficient support for them and after John put CofC on notice.

### B.    John Will Suffer Irreparable Harm Absent Injunctive Relief

"Irreparable injury is suffered when monetary damages are . . . inadequate." *Multi—Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551-52 (4th Cir. 1994), abrogated on other grounds *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008) (2008) (citation omitted) (internal quotation marks omitted). Further, the party seeking injunctive relief must demonstrate that "irreparable injury is *likely in* the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original).

First, John, as a result of Jane's false statements has taken a leave of absence from the CofC. He further faces serious and substantial disciplinary sanctions, including expulsion from CofC, if he is found responsible for Jane's allegations. An expulsion, for example, will be permanently noted on his transcript, which will make transferring to a new school almost impossible. In the context of a college disciplinary matter and resulting sanctions, a plaintiff's inability to continue or complete his education is irreparable harm. *E.g.*, *Jones v. Bd. of Governors of Univ. of N. Carolina*, 557 F. Supp. 263, 266 (W.D.N.C. 1983), *aff'd by* 704 F.2d 713 (4th Cir. 1983) (granting injunction and finding irreparable harm because student could not be adequately compensated for delay in obtaining degree caused by suspension); *Ritter v. Oklahoma*, No. CIV-16-043 8-HE, 2016 U.S. Dist. LEXIS 60193, at *8 (W.D. Okla. May 6,

13

2016) ("The loss of educational and career opportunities he will encounter if he is not reinstated and allowed to graduate is not readily compensable in money damages.").

Second, CofC's actions and the potential sanction(s) it may impose on John warrant a finding of irreparable harm. As the district court noted in *Doe v. Brandeis*:

> A finding of responsibility for sexual misconduct can also have significant consequences off-campus. Post-graduate educational and employment opportunities may require disclosure of disciplinary actions taken by a student's former educational institution. . . . Finally, a . . . student who is found responsible for sexual misconduct will likely face substantial social and personal repercussions. It is true that the consequences of a university sanction are not as severe as the consequences of a criminal conviction. Nevertheless, they bear some similarities, particularly in terms of reputational injury. Certainly stigmatization as a sex offender can be a harsh consequence for an individual who has not been convicted of any crime, and who was not afforded the procedural protections of criminal proceedings.

177 F. Supp. 3d 561, 601-602 (D. Mass. 2016). And the *Brandeis* court is not alone in emphasizing the stigma of a sexual misconduct finding on a student after college. *See Ritter*, 2016 U.S. Dist. LEXIS 60193, at *8 (holding that harm to student who was expelled for violation of university's sexual misconduct policy outweighed any burden imposed on the university by the issuance of an injunction); *King v. Depauw Univ.*, No. 2:14-cv-70-WTL-DKL, 2014 U.S. Dist. LEXIS 117075, at *39-40 (S.D. Ind. Aug. 22, 2014) (holding that plaintiff had demonstrated irreparable harm because money damages are "unlikely to fully erase the stigma associated with a such of funding [of sexual misconduct'").

John acknowledges that unlike cases cited above, CofC's investigation and disciplinary process is not yet complete. Nor has CofC adjudicated him responsible for violating any provision of its policy. However, in light of the Charleston Police Department's investigation and its conclusion, CofC should have quickly resolved its Title IX investigation in favor of John.

14

Instead, CofC has refused to defer to the findings of the Charleston Police Department and has proceeded with its investigation. This continued investigation—and potential hearing—are proceedings infected with impermissible gender bias.

Stated simply, John should not be required to exhaust the internal remedies available to him at CofC if doing so will only increase the harm to him and if there is no legal basis to proceed. In other words, a plaintiff need not exhaust any internal grievance procedures before filing suit in federal court, if the grievance process is a sham or efforts would be futile. *See United States v. M/V Santa Clara I*, 819 F. Supp. 507, 513 (D.S.C. 1993) (citing *Darby v. Kemp*, 957 F.2d 145, 147 (4th Cir. 1992)). John will suffer irreparable harm if this Court permits CofC to continue its investigation of him. Because the Charleston Police Department has already investigated this matter and found insufficient evidence and probable cause to support Jane's allegations, John should be afforded closure.

### C.     The Balance of the Hardships Favors John.

An order enjoining CofC from continuing to investigate John does not harm CofC as much as it would harm John should this Court not grant an injunction. If no injunction is issued but John ultimately prevails, he will have been irreparably harmed by facing an unnecessary investigation and potentially a hearing into Jane's allegations at CofC. John will struggle to return to CofC and will struggle to transfer to another college while the investigation is pending. The balance of the equities is in John's favor.

In the case of *King v. DePauw University, supra*, a district court provided analysis pertinent to the case at bar. In *King,* when examining whether to grant a preliminary injunction sought by a plaintiff student who was found responsible for sexual misconduct and banned from campus, the court explaining the following:

> the Court finds that if DePauw ultimately wins this suit, the harm it will have suffered by King's court-ordered return to campus this fall, while real, will not be as great as the harm King will have suffered if he is not permitted to return to campus but ultimately wins. A win by DePauw would vindicate its policies and its process in this case. King will still have been found responsible for sexual misconduct by DePauw, as his record will reflect, and he would have suffered significant consequences, although not the full extent of the consequences DePauw intended him to suffer. On the other hand, as discussed above, if the situation is reversed, in the absence of a preliminary injunction King will continue to suffer real, unavoidable consequences even if he wins this suit. Accordingly, the Court finds that the balance of equities is firmly in King's favor.

*King*, 2014 U.S. Dist. LEXIS 117075, at *41-42.

### D.     The Public Interest is Best Served by Granting Injunctive Relief.

The public has an interest in ensuring that its public institutions follow proper procedure and do not engage in discrimination. Further, "[p]romoting compliance with Title IX serves the public interest." *Barrett v. W. Chester Univ. of Pennsylvania of the State Sys. of Higher Edn.*, No. 03-CV-4978, 2003 U.S. Dist. LEXIS 21095, at *50-51 (E.D. Pa. Nov. 12, 2003) (citing *Cohen v. Brown Univ.*, 809 F. Supp. 978, 1001 (D.R.I. 1992)). Accordingly, the public interest is best served by granting injunctive relief.

### CONCLUSION

John has met the criteria for injunctive relief and is at imminent risk of irreparable harm. For all the above reasons, he asks this Court to grant his motion for preliminary injunction enjoining CofC.

Respectfully submitted,

DeANTONIO LAW FIRM, LLC

*s/Stephen F. DeAntonio*
Stephen F. DeAntonio, Fed. Id. No. 1049
Post Office Box 30069
Charleston, SC 29417
(843) 577-8080
(843) 577-4188 (fax)
*sdeantonio@deanlawfirm.com*

October 5, 2017
Charleston, South Carolina